## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **JENNIFER R. BENTON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 6:04-CV-073-C** |
| | § | **ECF** |
| | § | **Referred to the U.S. Magistrate Judge** |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION

**THIS MATTER** is before the court upon Plaintiff's complaint filed December 17, 2004, for judicial review of the administrative decision of the Commissioner of Social Security denying Plaintiff's applications for a period of disability and disability insurance benefits and for supplemental security income benefits under Title II and Title XVI of the Social Security Act. Plaintiff filed a brief in support of her complaint on June 6, 2005, Defendant filed her brief on June 30, 2005, and Plaintiff filed her reply on July 6, 2005. The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this matter to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. This court, having considered the pleadings, the briefs, and the administrative record, recommends that the United States District Judge affirm the Commissioner's decision and dismiss the complaint with prejudice.

## I.   STATEMENT OF THE CASE

Plaintiff filed applications for a period of disability and disability insurance benefits on April 7, 1999, and for supplemental security income benefits protectively on December 7, 1998. Tr. 14. Plaintiff's applications were denied initially and upon reconsideration. Tr. 14, 466-68, 470-76. Plaintiff then filed applications for a period of disability insurance benefits on June 20, 2001, and for supplemental security income benefits protectively on April 19, 2001, alleging a disability date of February 13, 1995. These applications were also denied initially and upon reconsideration. Tr. 14, 453-56, 458-64, 549-52, 554-60.

Plaintiff filed a Request for Hearing by Administrative Law Judge on March 27, 2002, and this matter came for hearing before the Administrative Law Judge ("ALJ") on July 30, 2003. Tr. 14, 31-46. Plaintiff, represented by an attorney, testified in her own behalf. Tr. 34-41. Dr. Ann Turbeville, a medical expert ("ME"), and Michael Driscoll, a vocational expert ("VE"), appeared and testified as well. Tr. 14, 41-43, 44-46. The ALJ issued a decision unfavorable to Plaintiff on August 26, 2003. Tr. 14, 478-88.

Plaintiff submitted a Request for Review of Hearing Decision/Order and on January 16, 2004, the Appeals Council issued its Order of Remand, vacating the prior hearing decision and remanded the case to an ALJ for resolution of several issues. This matter came for a new hearing before the ALJ on April 21, 2004. Tr. 14, 47-69. Plaintiff, this time represented by a non-attorney, testified in her own behalf. Tr. 50-63. Dr. Ann Turbeville, an ME, again testified. Tr. 63-67. Shelly Eike, a VE, appeared and also testified. Tr. 67-68. On June 22, 2004, the ALJ again issued a decision unfavorable to Plaintiff. Tr. 11-22.

In his opinion the ALJ noted that the specific issue was whether Plaintiff was under a disability within the meaning of the Social Security Act. With regard to the application for a period of disability and disability insurance benefits, he found that Plaintiff met the disability insured status

requirements through the date of his decision and that Plaintiff, although she had worked – and was still working – part-time as an office clerk, had not engaged in substantial gainful activity at any time since February 13, 1995, the alleged disability date.  Tr. 15, 21.  He found that Plaintiff has "severe" impairments, including major depression, fibromyalgia, and joint pain.  Tr. *Id.*  He further found that Plaintiff's severe impairments, singularly or in combination, were not severe enough to meet or equal in severity any impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1.  Tr. 19, 21.

The ALJ indicated that he has considered all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-6p.  Tr. 19.  He indicated that he had also considered the opinion of the state agency medical consultant, who opined that Plaintiff could perform light work.  *Id.*  The ALJ noted Plaintiff's testimony of working part-time, getting frustrated and depressed at times, and feeling overwhelmed when working 20 hours during one week.  *Id.*  He noted Plaintiff's testimony regarding her previous work, her diagnosis of depression, her anxiety, her back pain, her lack of strength, and her changing appetite.  *Id.*  He also noted Plaintiff's testimony of being able to stand for about 20 minutes, walk for about 20 minutes, and sit for an hour.  Tr. 20.  The ALJ found that Plaintiff's statements concerning her impairments and their impact on her ability to work were not entirely credible in light of her description of her own activities, the degree of medical treatment required, the medications taken to relieve pain, the reports of the treating and examining physicians, and the findings made on examination.  Tr. 20-21.

Plaintiff's past relevant work has been as a food service worker, dining room attendant, sales clerk, companion, baker, and office clerk.  Tr. 20.  The ALJ noted that Plaintiff was considered a "younger individual" with a high school education.  *Id.*; 20 C.F.R. §§ 416.963, 416.964.

The ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform the exertional demands of light work, limited to jobs that require only simple, repetitive tasks, that only require incidental contact with the public, and that have no requirement to cooperate with co-workers while in the performance of her job duties. Tr. 20. If an individual can perform light work, it is determined that he or she is also capable of sedentary work. *Id.* The VE testified that Plaintiff's past relevant work as a general office clerk was performed at the sedentary exertional level. *Id.* The ALJ accepted the testimony of the VE and found that Plaintiff could return to her past relevant work as a general office clerk and was, therefore, not disabled any time through the date of his decision. Tr. 21-22.

Plaintiff submitted a Request for Review of Hearing Decision/Order on July 12, 2004. Tr. 9-10. The Appeals Council issued its opinion on October 22, 2004, indicating that although it had considered the contentions raised in Plaintiff's Request for Review, it nevertheless concluded that there was no basis for changing the ALJ's decision and denied Plaintiff's request. Tr. 6-8. The ALJ's decision, therefore, became the final decision of the Commissioner.

On December 17, 2004, Plaintiff commenced this action which seeks judicial review of the Commissioner's decision that Plaintiff was not disabled.

## II.   STANDARD OF REVIEW

An individual may obtain a review of the final decision of the Commissioner by a United States District Court. 42 U.S.C. § 405(g). The court's review of a denial of disability benefits is limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002)(citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Masterson v. Barnhart*, 309

F.3d 267, 272 (5th Cir. 2002); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  The court will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. *Masterson,* 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* (quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).

In order to qualify for disability insurance benefits or supplemental security income, a claimant has the burden of proving that he or she has a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity.  Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. *Newton,* 209 F.3d at 452; *see* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1527(a)(1).

The Commissioner follows a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *Masterson*, 309 F.3d at 271; *Newton*, 209 F.3d at 453.  In this case, the ALJ found at step 4 that Plaintiff was not disabled because she could return to her past relevant work as a general office clerk.  Tr. 21-22.

## III.   DISCUSSION

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence in the record because the ALJ inappropriately relied upon the testimony of the ME and did not obtain a treating source statement as to the specific limitations imposed by Plaintiff's mental impairments.   The ultimate issue is whether the ALJ's decision is supported by substantial evidence. The court, therefore, must review the record to determine whether it "yields such evidence as would allow a reasonable mind to accept the conclusion reached by the ALJ." *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000).

On March 15, 1995, Dr. P. Chang noted that Plaintiff was "doing well at this time" and had "good results with Effexor.[1]" Tr. 243. He indicated that Plaintiff "is able to function better." *Id.*

Plaintiff underwent psychiatric evaluation by Lloyd L. Downing, M.D., on October 13, 1995, in conjunction with the services she received from MHMR Concho Valley. Tr. 306-07. Dr. Downing's diagnostic impression was adult ADD and dysthymia. Tr. 307. He also indicated that Plaintiff had been stable on her medication dosages for approximately one year. *Id.* Dr. Downing noted on December 28, 1995, that Plaintiff continued to do well with the Effexor, was resting well, and continued her work. Tr. 305. He indicated that she was alert and attentive and appeared stable on her medication. *Id.* Dr. Downing indicated in his progress note dated June 6, 1996, that Plaintiff reported her belief that the Effexor shortened her attention span. Tr. 301. He indicated that Plaintiff's expression was euthymic, her thought processes and content appeared normal, and she was alert and attentive. *Id.* He opined that Plaintiff's observation was not accurate and that she did not appear disorganized. *Id.* Plaintiff's Effexor was increased, and on July 3, 1996, Dr. Downing indicated that she was doing well. Tr. 301. He indicated that Plaintiff was neat and well-groomed, attentive to her personal appearance, was friendly and cooperative, appeared euthyumic, emotional response was appropriate, and she was alert and attentive with no indication of a thought disorder. Tr. 300. Plaintiff was discharged from MHMR Concho Valley services when she moved to Sweetwater to attend school. Tr. 298. Her therapist/case worker noted on January 6, 1997, that Plaintiff appeared to do well on the medication received, although her medication was adjusted and she experienced an increase in dysthymic symptoms when between jobs. *Id.*

Plaintiff was admitted to Big Spring State Hospital on August 7, 1998, after not taking her medication, decompensating, becoming more depressed and feeling suicidal, and reporting to a

---

[1]     Effexor® (venafaxine hydrochloride) is indicated for the treatment of depression. *Physicians' Desk Reference* (58th ed. 2004) at 3413.

physician that she had a plan to kill herself.  Tr. 355-57.  At discharge it was noted that she was not

suicidal, was in full contact with reality, and was not a danger to herself or others.  Tr. 358.  Her

Global Assessment of Functioning ("GAF")[2] score on admission was noted to be 35[3] and was 55[4]

upon discharge.  Tr. 359.

A progress note from Humberto Diaz, M.D., a psychiatrist who treated Plaintiff through

MHMR, indicated a change in her diagnosis on November 18, 1998, to major depression, recurrent,

severe, superimposed from dysthymia and social phobia.  Tr. 290.  Dr. Diaz indicated that he

planned to decrease the Effexor and switch to Paxil.[5]  *Id.*

Plaintiff was admitted on December 16, 1998, to Big Spring State Hospital and requested

a discharge on December 23, 1998.  Tr. 337.   Her GAF on admission was noted to be 35.  Tr. 351.

Dr. W. David Todd, who examined Plaintiff, opined that she had some dependent traits and

indicated that her last hospitalization was not entirely beneficial, as she seemed to get worse and

made more manipulations and suicide gestures.  *Id.*  He opined that Plaintiff's diagnosis included

---

[2]     The GAF score on Axis V is for reporting the client's "psychological, social, and occupational functioning." *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32 ("DSM-IV").  This report of overall functioning is noted to be "useful in planning treatment and measuring its impact, and in predicting outcome."  *Id.*

[3]     A GAF score of 31 to 40 indicates some "impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."    *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

[4]     The DSM-IV defines a GAF of 51-60 as moderate symptoms (e.g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

[5]     Paxil® (paroxetine hydrochloride) is an orally administred pscyhotropic drug. PHYSICIAN'S DESK REFERENCE (57th ed. 2003) at 1603.  Paxil is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, social anxiety disorder, panic disorder, and generalized anxiety disorder.  *Id*. at 1604-1605.

major depression, recurrent, moderate on Axis I[6] and personality disorder, not otherwise specified, with borderline, avoidant, and dependent traits on Axis II.  *Id.*  Dr. Todd noted that Plaintiff had applied for disability benefits, which he stated made her recovery even more difficult.  *Id.*

Plaintiff was admitted to Big Spring State Hospital again for acute psychiatric services on December 31, 1998, and was discharged on January 30, 1999.  Tr. 327.  Plaintiff had apparently abraded both wrists in a suicide gesture.  Tr. 328.  Her GAF was noted to be 20.[7]  Tr. 330.  Plaintiff denied all features which would give her the diagnosis of a major depressive episode by DSM-IV criteria; but the physician who treated her noted that she was "displaying a lot of characterlogic features which appear to be a mixture of borderline histrionic and dependant traits."  *Id.*

A progress note from Dr. Diaz dated August 5, 1999, indicates that Plaintiff was "doing very well" on her medications, was sleeping well, reported no side effects, and experienced a big difference with the medication with regard to her agoraphobia.  Tr. 276.  Dr. Diaz noted that Plaintiff still had some social anxiety but felt "much better by far" when out in public.  *Id.*  He noted that Plaintiff expected to begin working in the next week.  *Id.*  On November 3, 1999, Dr. Diaz noted Plaintiff's plan to attend school.  Tr. 272.  He noted her report that her present job was a bit too boring and not challenging for her.  *Id.*  Dr. Diaz noted that they discussed the risk factors of Plaintiff going to school, and Plaintiff presented solid arguments and good reasons.  *Id.*  Dr. Diaz noted no thought disorganization or delusions and opined that Plaintiff was doing well.  *Id.*

---

[6]     The axial system of evaluation enables the clinician to comprehensively and systematically evaluate the mental disorders and general medication conditions, psychosocial and environmental problems, and level of functioning of a person.  *See generally, American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 25-30.  Axis I is used to report all clinical disorders, except for personality disorders and mental retardation, which are reported on Axis II.  *Id.*

[7]     A GAF score of 11-20 indicates "some danger of hurting self or others" or occasional failure to maintain n minimal personal hygiene, or gross impairment in communication.  *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 34.

Dr. Charles A. Bray next treated Plaintiff at MHMR.  Tr. 268.  Dr. Bray's progress note dated September 14, 2000, indicates that Plaintiff was working at the election center, was eating and sleeping okay, was experiencing no adverse side effects, had no suicidal ideation, was not psychotic, was not hypomanic, had enough energy, and was alert, coherent, and congenial.  *Id.*  He noted Plaintiff's mood was moderate dysphoria, with only fair eye contact, although her personal grooming was adequate, she was not tearful, she had no peculiar mannerisms, and she was not hostile.  *Id.*  Dr. Bray noted on November 9, 2000, that Plaintiff continue to work, was eating and sleeping satisfactorily, had no averse side affects, and mood was of moderate dysphoria.  Tr. 265. On December 28, 2000, Dr. Bray noted that Plaintiff was not doing as well, had difficulty sleeping at night, and had been unable to work daily at her job at the election center.  Tr. 263.

Plaintiff was admitted to Big Spring State Hospital on January 11, 2001, and was discharged on March 9, 2001.  Tr. 323.  She was admitted after she took an overdose of Paxil.  Tr. 323, 420. She indicated that she had taken two bottles of medication because she "wanted to end it all" and was initially admitted to the Shannon West Texas Memorial Hospital on January 10, 2001, and transferred to Big Spring State Hospital a day later.  Tr. 420.  Her GAF upon admission was noted to be 20. Tr. 323.  Plaintiff's condition "slowly and steadily improved" and she was discharged.  Tr. 324.  At the time of discharge no restrictions were placed on her physical activities.  *Id.*  Her GAF score at discharge was noted to be 60.  Tr. 325.

After Plaintiff was discharged from Big Spring State Hospital, Dr. Bray examined her on March 16, 2001. Tr. 261.  He noted that Plaintiff had no suicidal thinking or ideation, with no psychotic symptoms, and was alert and congenial, with no adverse side effects reported.  Tr. 261. On April 17, 2001, Dr. Bray noted that Plaintiff was alert and pleasant and in fairly good spirits. Tr. 260.  He noted that she was able to concentrate when reading, her verbal productions were coherent, her mood was of mild dysphoria with no inappropriate affect.  *Id.*  Dr. Bray noted on

May 30, 2001, that Plaintiff was able to concentrate while reading and on working on her hand projects. Tr. 257. He opined that Plaintiff isolates herself from other people but encounters no difficulty being in public places. *Id*. On August 23, 2001, Dr. Bray noted that Plaintiff had been less isolated from other people and was reading a book on fibromyalgia. Tr. 254. A progress note from November 16, 2001, indicates that Plaintiff has enjoyed being with other people, was compliant with her medication with no adverse side affects, had no psychotic or hypomanic symptoms, and had a mildly dysphoric mood. Tr. 251. He noted that Plaintiff enjoyed her job. *Id*. On February 5, 2002, Dr. Bray noted that Plaintiff was working one or two days weekly and was in good spirits and relaxed. Tr. 247.

Plaintiff underwent a psychiatric consultative examination by Ralph G. Hodges, M.D., on March 3, 1999. Tr. 375-77. Dr. Hodges noted that Plaintiff appeared depressed, anxious, and blunted. Tr. 376. He noted her memory seemed to be good, insight was intact, and judgment appeared to be good. *Id*. He noted that she was able to care for her own needs and reported that she found it difficult to converse with anyone other than her immediate family. Tr. 377. Dr. Hodges opined that Plaintiff was able to concentrate and her persistence and pace were intact. *Id*. He opined that her diagnoses included schizo-affective psychosis, with paranoia and depressed features on Axis I and borderline personality disorder on Axis II, and he assessed a GAF score of 45[8] at the time of the assessment and over the previous year. Tr. 377.

Dr. Hodges treated Plaintiff at River Crest Hospital in 2001. Plaintiff was admitted on January 3, 2001, and was discharged on January 8, 2001. Tr. 378. She was admitted after indicating that she was suicidal and had a plan to kill herself. Tr. 378. She was discharged after being

---

[8]     A GAF of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning. *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

stabilized.  Tr. 379.  Dr. Hodges opined that Plaintiff's diagnosis on Axis I was major depression with suicidal ideation, self-injurious behavior, and psychotic features, in fair remission, and borderline personality disorder on Axis II.  *Id*.  He further opined that her GAF upon admission was 25, 55 at the highest over the previous year, and 50 upon discharge.  Tr. 380.

Dr. Bray indicated in a progress note dated August 22, 2001, that Plaintiff complained of despondency but no suicidal behavior.  Tr. 529.  Plaintiff reported no drug side effects.  *Id*.  She complained of episodes of being tearful, not having enough energy, and indicated that she spent her days working on hand projects.  *Id*.  Dr. Bray opined that her GAF score was 60.  *Id*.

Plaintiff underwent an internal medicine consultative examination on December 14, 2001.  Tr. 429-433.  The consultative examiner ("CE"), John L. Read, M.D., noted Plaintiff's report of being sensitive to loud noises.  Tr. 430.  He noted that Plaintiff was quite agile in the examining room and hopped up on the exam table and then hopped down when done.  Tr. 432.  He noted that she had fair muscle tone with normal gait, motor function, cerebration, speech, and cranial nerves.  *Id.*  With regard to functional limitations, Dr. Read opined that Plaintiff has no difficulty sitting; is able to walk one mile if she goes slowly; is able to be "up and about" approximately 4 hours on a good day; can stand still for only 2 minutes because of knee pain; can carry 30 pounds for short distances; has no difficulty with handling small objects, although she does experience finger pain; grip is 5/5 in either hand; range of motion of upper and lower extremities is normal; and she uses a cane when her back is hurting, about 1/4 of the time.  Tr. 432-33.

Plaintiff underwent a psychiatric consultative examination by Carlos Escobar, M.D., on January 18, 2002.  Tr. 438-41.  Dr. Escobar noted that Plaintiff had moved out of her parents' home into an apartment about 11 months previously.  Tr. 440.  He noted that she cares for her finances, is abmulatory, uses no orthopedic device, and spends her free time studying languages and reading.  Tr. 440.  She reported that she is not physically active, but she takes short walks, rides a bike to

work, goes to church periodically, does her grocery shopping with her father since she has no transportation, listens to music, and does her own laundry and cooking. *Id*. Dr. Escobar noted that upon examination, Plaintiff's attention and concentration span were normal, memory was intact, mood was described as chronically depressed but feeling better now, and she had no paranoia or psychosis. Tr. 441. He opined that Plaintiff had recurrent depressive disorder, in partial remission with her medication, and opined that her GAF score was 50. *Id*.

Plaintiff again received inpatient treatment in September and October 2003, first at Shannon Medical Center and then at Big Spring State Hospital. Tr. 538. She denied being suicidal or having any intent to kill herself. Tr. 534. However, she indicated that she desired to cut herself to relieve tension. *Id*.

The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight in determining disability. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). On the other hand, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456.

However, "[a]mong the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.' These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'" *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)(citing 20 C.F.R. § 404.1527(e)(1)).

-12-

Plaintiff alleges that the ALJ erred by failing to obtain a treating source statement as to what she may do despite her impairments, thereby breaching his duty to fully and fairly develop the record. She argues that the ALJ was required to obtain such a treating source statement and give it controlling weight, as described by *Newton*.

A medical source statement is a "statement about what [the claimant] can still do despite [her] impairment(s)" made by the claimant's medical source and based on that source's own medical findings. 20 CFR §§ 404.1513(b) and (c) and 416.913(b) and (c). Social Security Ruling 96-5 (July 2, 1996)("SSR 96-5p") describes the role of the medical source statement as it relates to the determination of the claimant's RFC. Medical source statements are "medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5p. The medical source statement is an opinion submitted by a medical source as part of a medical report. *Id*. Such statements are based on the individual source's records and examination of the individual and may provide an incomplete picture of the claimant's abilities. *Id*. Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of an individual's impairment(s). *Id*. However, the medical source statement is separate and distinct from the RFC assessment.

The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities. SSR 96-5p. The RFC assessment is based upon "*all* of the relevant evidence in the case record," including, but not limited to, medical history, medical signs, and laboratory findings; the effects of treatment; and reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations.

Soc. Sec. Ruling 96-8p (July 2, 1996)("SSR 96-8p")(emphasis in original). The ALJ is responsible for determining a claimant's RFC. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

As noted in SSR 96-5p, because of the importance of treating source evidence, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator is required to make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Plaintiff argues that the ALJ erred by failing to obtain a medical source statement specifically describing what Plaintiff could do. Plaintiff further argues that the ALJ erred by relying upon the testimony of the ME in determining the limitations imposed by her impairments, which were incorporated into the RFC assessment.

Usually, the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing. *Ripley*, 67 F.3d at 557. The absence of such a statement, however, does not, in itself, make the record incomplete. 20 C.F.R. § 404.1513(b)(6). In a situation where no medical statement has been provided, the court inquiry "focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record." *Ripley*, 67 F.3d at 557. The ALJ may seek additional evidence or clarification from a claimant's medical source when the report from that source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or it does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512.

In *Ripley*, the Fifth Circuit considered the Commissioner's argument that the medical evidence – specifically, reports discussing the extent of the claimant's injuries – substantially supported the ALJ's conclusion as to the limitations imposed by his impairments. *See Ripley*, 67 F.3d at 558 n.27. The Court noted that "[w]ithout reports from qualified medical experts, however,

-14-

we cannot agree that the evidence substantially supports the conclusion that Ripley was not disabled because we are unable to determine the effects of Ripley's conditions, no matter how 'small,' on his ability to perform sedentary work." *Id.*

A "medical adviser" is a neutral consultant who, at the request of the Social Security Administration, reviews a claimant's medical records, explains or clarifies information reflected therein, and expresses expert opinions as to the nature and severity of impairments and whether such impairments equals the criteria of any impairment in the Listing of Impairments. 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.912(b)(6), and 416.927(f)(2)(iii). When a medical professional functions as an expert witness in the course of an evidentiary hearing before an ALJ, Social Security Ruling 96-6p designates the medical professional as a "medical expert." Social Security Ruling 96-6p (July 2, 1996)(""SR 96-6p"). Clearly, an ALJ may rely upon testimony of a medical adviser when evaluating the nature and extent of a claimant's impairments. *Richardson v. Perales,* 402 U.S. 389, 408 (1971). Plaintiff essentially argues that the testimony of the ME does not constitute substantial evidence in support of the ALJ's RFC finding. She argues that a non-examining ME may be legitimately called to offer testimony regarding any conflict in diagnoses or opinions about work-related limitations between or among any examining physicians, to explain the etiology of a disease or the significance of clinical or laboratory findings in the record, or to make a determination of whether an impairment meets or equals in severity any impairment in the Listing of Impairments. She is correct. However, Plaintiff further argues that the ALJ was required to recontact her treating sources for a determination of the limitations imposed by her impairments and could not rely upon the testimony of the ME in determining the limitations imposed by Plaintiff's impairments and making his RFC determination in this matter.

In *Masterson*, the Fifth Circuit noted that the ALJ relied upon the testimony of the ME as to the limitations imposed by the claimant's mental impairment. *Masterson*, 309 F.3d at 270 (noting

-15-

that the ME testified that the claimant experienced slight restrictions on daily activities, slight to moderate difficulties in social functioning, and seldom to often-experienced deficiencies of concentration). In *Leggett*, the Fifth Circuit noted that the ALJ relied in part upon the testimony of the ME, who opined, based on the evidence in the record, that the claimant was capable of performing sedentary work. *Leggett v. Chater,* 67 F.3d 558, 565 (5th Cir. 1995). As noted above, in *Ripley*, the Fifth Circuit specifically noted that the absence of a medical source statement "does not, *in itself*, make the record incomplete." *Ripley*, 67 F.3d at 557 (emphasis supplied). Reading these authorities together, it is apparent that reliance upon the ME testimony in determining Plaintiff's limitations was not, in and of itself, error nor did it render the RFC assessment inherently erroneous. The Court does not find that the ALJ may not rely upon the testimony of the ME, based on the medical evidence in the record, in determining the limitations imposed by the Plaintiff's impairments and in making his RFC assessment. Applicable authority demonstrates that the testimony of the ME may be used by the ALJ.

Plaintiff argues that the "primary purpose" for the ME's testimony was to avoid developing the evidence from treating sources as the ALJ was required to do by the regulations. Pl. Reply at 5. However, there is extensive evidence in this case from numerous examining and treating sources. Applicable case law in the Fifth Circuit requires remand for failure to re-contact a treating physician when the physician's records are inconclusive or otherwise inadequate to receive controlling weight, the record contains no other medical opinion evidence based on personal examination or treatment, and the claimant proves prejudice. *Newton*, 209 F.3d at 453. Thus, the duty to re-contact a claimant's treating medical source is limited to cases where existing medical evidence is inadequate to make a disability determination, either because it is internally conflicting, is incomplete, or is based on unconventional or questionable diagnostic techniques. This view is consistent with Social Security Ruling 96-2p (July 6, 1996)("SSR 96-2p"), which notes that additional evidence or

clarifying reports may be necessary when the treating source's medical opinion appears lacking or inconsistent.  This view is also consistent with SSR 96-5p, which, as discussed previously, requires that the ALJ make a reasonable effort to re-contact a treating source if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the ALJ cannot ascertain the basis of the opinion from the case record.  The court must consider whether the ALJ's determination of the limitations imposed by Plaintiff's impairments, derived in part from the ME testimony, is supported by substantial evidence in the record.

In his opinion the ALJ discussed the findings of Dr. Hodges, a psychiatric CE, who also treated Plaintiff during a period of hospitalization.  Tr. 15-16.  The ALJ discussed Plaintiff's hospitalizations, her treatment, and the prognoses noted by the treating sources. Tr. 16.  The ALJ noted the findings and impressions of Dr. Read, the internal medicine CE, specifically noting the functional limitations contained in Dr. Read's opinion.  *Id.*  The ALJ noted the report of Dr. Escobar, another psychiatric CE, who reported Plaintiff's move into her own apartment and her reports of keeping track of her own appointments, as well as her activities such as grocery shopping, going to church, listening to music, doing her own laundry, and cooking.  Tr. 17.  The ALJ noted Dr. Escobar's finding upon examination and his opinion that Plaintiff had a GAF score of 50.  *Id.*  The ALJ described the findings of Dr. Dan Stultz, who treated Plaintiff for fibromyalgia, and  who noted that Plaintiff was overall doing well and that her fibromyalgia seemed to be better and more stable. *Id.*  The ALJ noted the opinion of Ms. Sheryl Ann Goodman, a counselor, who indicated that Plaintiff's prognosis for becoming fully self-supporting was poor and who described Plaintiff's progress as extremely poor.  Tr. 17-18.  He noted Plaintiff's treating record from her September 2003 hospitalization and the changes in her medication regime.  Tr. 18.  He also noted Plaintiff's treatment notes from MHMR Concho Valley, as well as Plaintiff's report of having a "rough time" at work, and the observations of the nurse.  *Id.*

The ALJ discussed the testimony of Ann Turbeville, M.D., the ME.  Dr. Turbeville is a physcian practicing psychiatry.  Tr. 41.  Dr. Turbeville testified that Plaintiff has a diagnosis of fibromyalgia, joint pain, muscle pain, personality disorder (cluster B type), major depression, and dysthymia.  Tr. 18.  She also testified that Plaintiff's RFC is reduced to light level work; she would be limited to work at the lower end of detailed or simple imstruction, she would have a problem with criticism, she would not be good with multitasking, she does not deal well with anger or the public, and she would not be good at making decision.  Tr. 18, 64-65.  The ALJ ultimately found that Plaintiff was limited to work at the light exertional level that did not require anything more than incidental public contact, that had no requirement to collaborate with co-workers in performing tasks, and that consisted of simple, repetitive-type tasks.  Tr. 21, 65.

Plaintiff argues that the record is "devoid of any credible medical opinion to support the ALJ's finding with respect to the [P]laintiff's mental limitations and her ability to perform past work."  Pl. Brief at 8-9.  However, Dr. Turbeville's opinion as to Plaintiff's diagnosis is consistent with the opinions of Dr. Diaz, Dr. Downing, and Dr. Todd.  Tr. 290, 307, 351.  Her opinion that Plaintiff does not deal well with anger or with the public and would not be good at making decisions is consistent with Plaintiff's own testimony, as well as the notes of various treating providers.  *See* Tr. 276 (Dr. Diaz notes that Plaintiff experiences some social anxiety); Tr. 357 (Dr. Bray notes that Plaintiff isolates herself but has no problem being in public places); Tr. 377 (Dr. Hodges notes that Plaintiff found it difficult to converse with people beyond her family).  Although Plaintiff argues that there is nothing in the record to demonstrate the basis of Dr. Turbeville's opinions, she testified that she had reviewed the medical records provided describing the treatment of Plaintiff's impairments and indicated that she had enough information regarding such impairments and their severity.  Tr. 63.  Dr. Turbeville noted the differing opinions of Plaintiff's treating providers, indicating that she carried a lot of different diagnoses.  Tr. 64.  She also noted that the GAF scores

are "very subjective" and are not used as they are designed to be used.  Tr. 65.  She testified that

Plaintiff does have problems and is going to have problems dealing with the public and anger.  Tr.

66.  She also testified that there is nothing in the diagnoses and narrative of Dr. Escobar, a

consulting, examining physician, which was significantly inconsistent with the restrictions that she

opined limited Plaintiff.  *Id.*  Dr. Turbeville testified that the borderline personality disorder would

probably keep Plaintiff at the lower end of detailed or simple work so that she would not have to

make a lot of independent valued judgments and open herself to criticism.  Tr. 43.  She also testified

that although there were no specific physical limitations with fibromyalgia, Plaintiff would probably

be limited to light work with no prolonged walking.  This is consistent with Dr. Read's opinion that

Plaintiff has no limitations in sitting, can walk about a mile, and can lift 30 pounds; has no difficulty

with handling small objects although she does experience finger pain; and has normal range of

motion of upper and lower extremities.  Tr. 432-33.  This is also consistent with Dr. Escobar's

indication that Plaintiff is able to ride a bike to work and has no physical limitations affecting the

upper and lower extremities.  Tr. 440.  Dr. Stultz, Plaintiff's treating physician for fibromyalgia,

completed a fibromyalgia RFC questionnaire and indicated that regarding Plaintiff's ability to sit

and stand, he "ha[d] no idea" and guessed she could sit and stand for 30 minutes at a time and sit

and stand/walk 2 or  "maybe 4" hours per day.  Tr. 443.

  In his opinion the ALJ extensively discussed the evidence in the record from Plaintiff's

treating physicians, the consultative physicians, and Plaintiff's testimony and subjective allegations.

He found that Plaintiff's statements concerning her impairments and their impact on her ability to

work were not entirely credible in light of her descriptions of her own activities, the degree of

medical treatment required, the medications taken to relieve pain, the reports of the treating and

examining practitioners, and the findings upon examination.  Tr. 20.   The ALJ relied, in part, upon

the testimony of the ME in determining the limitations imposed by Plaintiff's impairments.  I find

that the ALJ did not err in doing so as the testimony of the ME was consistent with Plaintiff's testimony and with the reports and notes of various treating and examining sources.

Plaintiff argues that there is no opinion in the record from a treating or examining physician concerning her specific functional limitations to support the ALJ's findings. However, as noted above, the ALJ's RFC finding was supported and is consistent with the notes and reports of Plaintiff's treating sources, the CEs, and Plaintiff's own reports and testimony. In *Ripley*, the ALJ relied solely upon portions of the claimant's testimony in finding that the claimant could perform the exertional requirements of sedentary level work. *Ripley*, 67 F.3d at 557. This case may, however, be distinguished from *Ripley*. The ALJ's RFC finding is supported by, and is consistent with, evidence in the record, which the ALJ appropriately discussed in his opinion. The RFC finding, moreover, is also appropriately based upon relevant evidence in the record, including medical history, medical signs, and laboratory findings; the effects of treatment; and reports of daily activities, lay evidence, recorded observations, and Plaintiff's statements and testimony. *See* SSR 96-8p. Rather than solely relying upon those portions of the claimant's testimony supporting his finding, as the ALJ did in *Ripley*, the ALJ in this matter relied upon evidence from various medical sources, as well as specific portions of Plaintiff's testimony and statements indicating that she could walk, lift/carry, sit, and stand to a degree consistent with sedentary work. The limitations incorporated into the RFC by the ALJ are consistent with the testimony of the ME, which was, in turn, consistent with the opinions and findings of various treating and examining sources.

Plaintiff argues that the ALJ failed to appropriately develop the record by failing to obtain a treating source statement as to the limitations imposed by her impairments. "The ALJ has a duty 'to develop the facts fully and fairly relating to an applicant's claim for disability benefits.'" *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)(quoting *Newton*, 209 F.3d at 458). The claimant has the

burden to prove that he is disabled within the meaning of the Social Security Act. *Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987).

This court may not reverse the decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000)(citing *Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996)). In order to establish prejudice, a claimant must demonstrate that he or she "could and would have adduced evidence that might have altered the result." *Carey*, 230 F.3d at 142 (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). Failure to recontact a medical source may constitute reversible error. In *Ripley*, the Commissioner's decision was reversed, and the matter remanded with instructions to obtain a report from a treating physician when the evidentiary record contained no medical source evidence whatsoever regarding the effects of the claimant's impairment on his ability to work. *See Ripley*, 67 F.3d at 557-58. In *Myers*, the Commissioner's decision was reversed and remanded where the ALJ had "summarily rejected the opinions of [the claimant's] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). However, there is substantial evidence in the record to support the ALJ's RFC finding, and Plaintiff has failed to demonstrate that she could and would have adduced evidence that might have altered the result. The record does not establish that the absence of a medical source statement made the record incomplete, and it does not establish that the ALJ was required to re-contact a medical source. Therefore, I find no prejudice in the failure of the ALJ to further develop the record, to re-contact a treating physician, or to obtain a medical source statement. *See Ripley*, 67 F.3d at 557.

## IV.    CONCLUSION

Based upon the foregoing discussion of the issues, the evidence, and the law, this court recommends that the United States District Judge affirm the Commissioner's decision and dismiss the Plaintiff's complaint with prejudice.

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1) and Rule 4 of Miscellaneous Order No. 6, For the Northern District of Texas, any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 11 days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within 11 days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the United States Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

DATED this 15th day of March, 2006.

**PHILIP R. LANE**
**UNITED STATES MAGISTRATE JUDGE**